BOGERT et al. v. SOUTHERN PAC. CO.

(District Court, E. D. New York. July 30, 1915.)

CORPORATIONS ⊜575—REORGANIZATION BY MAJORITY STOCKHOLDER—RIGHTS OF MINORITY STOCKHOLDERS.

Defendant corporation, through other corporations in which it owned the controlling interest, was the equitable owner of a majority of the stock of a railroad company against which a number of foreclosure suits were pending which had been consolidated. In this situation it joined with the bondholders in a plan of reorganization which was carried out by a

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

foreclosure decree and sale of all of the property and franchises of the railroad company which were subsequently conveyed to the reorganized company, its bonds being accepted in exchange by the old bondholders and its stock being issued to defendant on payment of the costs and expenses of the suits and reorganization. Defendant also controlled the claims of the general creditors of the old company, which, as against the property, were extinguished by the foreclosure sale. *Held*, that defendant in thus acquiring the property took it subject to the equitable rights of the minority stockholders, who were not parties to the reorganization, but were entitled to share in its benefits, and that it could not require them, as a condition to their acquiring their proportionate share of the stock of the new company on equal terms with itself, to pay their pro rata share of the claims of the general creditors of the old company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2305; Dec. Dig. ☞575.]

In Equity. Suit by Henry L. Bogert, Townsend Lawrence, and Anita Lawrence, as executors of the will of Walter B. Lawrence, deceased, suing on behalf of themselves and other stockholders of the Houston & Texas Central Railway Company similarly situated who may come in and contribute to the expenses of the action, against the Southern Pacific Company. Decree for complainants.

See, also, 211 Fed. 776.

Dittenhoefer, Gerber & James, of New York City (A. J. Dittenhoefer, H. Snowden Marshall, David Gerber, Russell H. Landale, and Dudley F. Phelps, all of New York City, of counsel), for plaintiffs.

Joline, Larkin & Rathbone, of New York City (Arthur H. Van Brunt, Henry V. Poor, and Lewis H. Freedman, all of New York City, of counsel), for defendant.

CHATFIELD, District Judge. This case arises from circumstances which have been considered in various litigations since the year 1892. Many of the facts are set forth in the opinions of Lawrence v. Southern Pacific Co. (C. C.) 180 Fed. 822; Bogert, as Executor, v. Southern Pacific Co., 228 U. S. 137, 33 Sup. Ct. 497, 57 L. Ed. 768; and Bogert v. Southern Pacific Co. (D. C.) 215 Fed. 218. On page 221 of the last-mentioned opinion, the suits and proceedings had are set forth in detail chronologically, and substantially all of the testimony in the present record is somewhere discussed or referred to in these various cases. But it is necessary in considering the present action to have before us a synopsis of the circumstances upon which the alleged cause of action is based.

The Houston & Texas Central Railway Company, organized under the laws of Texas, operated three lines in that state, with some 1,000 miles of track. The main line comprised 345 miles. The Western Division covered 118 miles of track, while the Waco & Northwestern Division comprised about 100 miles. Certain branches added 250 miles of track and 200 miles of sidings. The entire authorized amount of stock was 100,000 shares, of which 77,269 shares were actually issued. Public land had been granted by the state of Texas equal to 10,240 acres for each mile of road built, or about 4,500,000 acres in all.

A majority of the stock was acquired by the Morgan's Louisiana & Texas Railroad & Steamship Company in 1877. A majority of the stock of the Morgan Company was sold to the Southern Development Company, and in 1885 this stock of the Morgan Company was sold to the Southern Pacific Company, which thus indirectly controlled and owned a majority of the stock of the Houston & Texas Central Railway Company.

Eight of the nine directors of the railway company for four years preceding 1888 were either officers or directors of the Southern Pacific Company or its subsidiary companies. A mortgage to secure bonds amounting to $5,838,000 was held by Messrs. Easton and Rintoul as trustees against the property of the main line of the Texas & Houston Central Railway. Interest upon this mortgage was unpaid, and in 1885 suit was brought in the federal court of Texas asking an injunction to secure payment of certain moneys into the sinking fund. No foreclosure or sale of the property to pay the principal was then asked, for the mortgages did not become due until 1888. Nor did the trustees seek to take over the railroad company for default in the payment of interest, although this right was given them by their mortgage. The railway company filed an answer denying that the earnings of the railway were enough to provide for a sinking fund and alleging the filing of a bill by the Southern Development Company, which claimed to be a general creditor to the amount of some $2,000,000 and which asked for the appointment of a receiver. Receivers were appointed in the Southern Development Company action, upon February 22, 1885. In July, 1885, an answer was filed by the railway company admitting the allegations of the bill of the trustees Easton and Rintoul. In October, 1885, Easton and Rintoul as trustees demurred to the bill of the Southern Development Company, and in May, 1886, this demurrer was sustained and that bill dismissed.

In the meantime, Easton and Rintoul, as trustees also of a mortgage upon the Western Division, also brought suit asking substantially the same relief as with respect to the mortgage upon the main line. The railway company's answer was similar to its answer to the suit upon the main line mortgage.

On March 18, 1885, the Farmers' Loan & Trust Company of New York, as trustee under three mortgages upon the various lines of the railway company, filed a bill asking for a receiver, in which it was not alleged that the principal was due, but in which a sale of certain of the lands received from the state of Texas for a sinking fund was prayed, and in this bill it was alleged that the railway company had violated its obligation to sell this land in payment of their floating debts and other expenses. The right to enter and take possession until the arrears of interest were discharged was alleged. On June 22, 1885, the railway company answered the Farmers' Loan & Trust Company's complaint, denying the misapplication of funds and claiming that the funds received from the lands had been applied under the terms of the mortgage. On January 21, 1886, Easton and Rintoul, as trustees, filed a foreclosure bill, based upon the main line mortgage, alleging the control by the Southern Development Company of the

railway company and the institution of the suit by the Southern Development Company against the railway company in which receivers had been appointed. It was alleged that this was collusive, and the prayer for judgment asked that the principal of the bonds be declared due and payable.

The railway company filed an answer to this bill, claiming that the principal of the mortgage was not due and that no foreclosure for nonpayment of interest, or even for payment of principal when due, could be had until the public lands were first sold and a deficiency established. It was also alleged that, if the lands were carefully administered, they should pay the floating debt and the interest and principal of the bonded debt when due.

Also, upon the 21st day of January, 1886, Easton and Rintoul as trustees filed a bill for foreclosure of the consolidated mortgage upon the Western Division. The allegations were the same as in the suit upon the main line mortgage, and the answer of the railway company was also similar to the one in that action. On April 24, 1886, the Farmers' Loan & Trust Company, as trustee of the general mortgage above referred to, filed a bill reciting the above suits and praying that the railway company pay into court the interest and arrears, or, in default, that the lands of the company be sold. In case of deficiency, sale of the other property of the railway company was asked, and also that judicial sale be had as the rights of all the parties could not be fully protected otherwise. This general mortgage also did not provide for foreclosure for nonpayment of interest, but for nonpayment of the principal when due, and then only after sale of the lands with a deficiency.

The main line mortgage was not due until after 1888. On May 26, 1886, by consent, the three foreclosure suits were consolidated, and Messrs. Easton, Rintoul, and Dillingham appointed receivers of the entire property. Upon the next day, May 27th, the demurrer of Easton and Rintoul to the action brought by the Southern Development Company was sustained, and Clark and Dillingham, as receivers therein, were directed to turn over the property to Messrs. Easton, Rintoul, and Dillingham as receivers in the consolidated action. Other parties were brought in by amendments, and upon August 2, 1886, the Farmers' Loan & Trust Company filed an answer to the bill filed January 21, 1886, by Easton and Rintoul for the foreclosure of the main line mortgage.

This answer denied that the principal of that mortgage was due, and set up the same defenses as those urged by the railway company, and also to the effect that the first mortgage upon the main line covered but a part of the system and could not be foreclosed without injustice to other parties.

It was further urged as a defense that the only right possessed was to collect the interest in arrears by a sale of the lands before the sale of the railway company, and that the proceeds from the sale of the land would be sufficient, if properly administered, to pay the bonds issued under the main line mortgage.

On the same day, the Farmers' Loan & Trust Company filed an

answer to the suit by Easton and Rintoul to foreclose the Western Division mortgage raising the same issues.

On September 3, 1886, the railway company filed an answer to the bill of complaint of the Farmers' Loan & Trust Company for foreclosure of the general mortgage, in which it was denied that the covenants with relation to the sinking fund had been broken or that any unlawful sales of land had been made.

On April 30, 1888, a bill was filed to foreclose the income and indemnity mortgage alleging default in the principal and interest of the bonds secured by that mortgage, which was answered by the railway company, and on May 2, 1888, by the Farmers' Loan & Trust Company. On the same day it filed cross-bills in the suits on the main line and Western Division consolidated mortgage and on the Waco and Northwestern Division consolidated mortgage.

During the year preceding December 20, 1887, negotiations were under way with respect to these suits. A draft reorganization agreement was prepared and ultimately agreed upon by: (1) The holders of the main line first mortgage bonds; (2) holders of the Western Division first mortgage bonds; (3) holders of the Waco & Northwestern Division first mortgage bonds; (4) holders of bonds of the consolidated mortgage on the main line and Western Division; (5) holders of bonds of the consolidated mortgage on the Waco & Northwestern Division; (6) holders of general mortgage bonds; (7) the defendant herein, Southern Pacific Company; (8) Central Trust Company of New York. The first six parties were bondholders, the seventh party was the owner of the majority stock of the railway company, and the eighth party was interested to the extent of undertaking to carry out the reorganization agreement.

The minority stockholders of the Texas & Houston Railway Company are shown nowhere in the records to have had notice of or been parties to the negotiations until after foreclosure decree had been had. The reorganization agreement provided that all existing mortgages were to be foreclosed and a new company organized to take over all the property and franchises of the railway company.

The defenses interposed were not to be relied upon, and the Central Trust Company was to act as purchasing trustee, with power in its option to declare the principal of the bonds, deposited under the reorganization agreement, to be due, and to assist in the prosecution of or to become a party to any suits then pending or which might thereafter be brought.

All of the mortgages referred to (except the income and indemnity mortgage) had still some years to run, and none of these (except the income and indemnity mortgage) contained a provision for the foreclosure and sale of the road, except for nonpayment of the principal of the mortgage.

The income and indemnity bonds had previously been exchanged for general mortgage bonds and were held by the Farmers' Loan & Trust Company as collateral therefor. The suit on these income and indemnity bonds was begun upon April 30, 1888, as a part of the reorganization plan. Upon May 1st, the railway company filed an an-

swer admitting the allegations of this bill, and on May 2d the railway company answered the cross-bills of the Farmers' Loan & Trust Company in the other actions. On May 4th, decree of foreclosure and sale was entered in the consolidated actions.

The consent of the railway company to declare the principal due of the bonds which might be deposited was given by the Southern Pacific Company, controlling a majority of the stock of the railway company, and consent was likewise given, in the reorganization agreement, to the Central Trust Company to form the new corporation to which was to be conveyed all of the property purchased by the Central Trust Company as trustee. New bonds were to be issued, and the new corporation was to issue 100,000 shares of stock of the par value of $10,-000,000. All of this stock was to be given to the Southern Pacific Company, unless taken up at the terms offered by the creditors holding the floating debts and by the holders of stock in the railway company.

It is alleged that under this agreement the Southern Pacific Company intended to obtain possession of the railway company by freezing out, through impossible terms, the minority stockholders, unless they purchased the new stock at the pro rata price to be later fixed by the Central Trust Company so as to realize a sufficient amount to discharge the floating debt, the charges and expenses of reorganization, and the amount required for the holders of the mortgage bonds.

It is also alleged that the Southern Pacific Company was to be allowed to take up all the stock not taken over by the creditors or minority stockholders who should accept the proposition just referred to, upon payment merely of the cash required for the bonus to the holders of the first mortgage bonds and the necessary expenses of reorganization.

It is further alleged that the amount which would have to be paid by the Southern Pacific Company for this purpose was but $26 a share, while the amount that the minority shareholders would have to pay for the same stock was fixed finally at $71.40 a share. The result of this was that no stockholder or floating debt creditor undertook to pay for and take over a single share of the stock of the new company, and the Southern Pacific Company took the whole issue of $10,000,000 of stock at the price of $26 a share. The bondholders were actuated in accepting the new bonds by the improvement in their security through the ownership of all the property by the new company, and the ownership of the stock of that company by the Southern Pacific Company, as a part of its general system, while the old mortgages had nothing back of them except the property of the Houston & Texas Central Railway Company.

The Southern Pacific Company, owning the stock of and controlling the Southern Development Company, and having obtained from it the stock of the Morgan's Steamship Company, which in turn owned a majority of the Houston & Texas Central Railway Company, was in a position to waive, and in fact to relinquish substantially, all claims for the floating indebtedness which had accumulated against the Houston & Texas Central Railway Company, as the amount of those debts

had been advanced to a large extent by the Southern Development Company, or the Morgan's Steamship Company, or by the Southern Pacific Company itself.

It is evident that the proposition to reorganize, and to exchange bonds at a lower rate of interest, might be the best solution, from the standpoint of bondholders who had been unable to depend upon the payment of the larger rate of interest by the smaller and more helpless company. The new bonds were a more attractive proposition from every standpoint except the rate of interest offered.

The general or floating debt holders, however, if unable to buy in or protect the property at foreclosure, and if unable to secure the payment of their debts from the land owned by the railway, which land was also to be included in the foreclosure, would of course assent to a reorganization proposition, by which the entire property of the company would be turned over to the company owning these holders of general debts, subject to the payment of the reorganization expenses.

This in effect is what the reorganization meant to the Southern Pacific Company through its control of the Southern Development Company and the Morgan's Steamship Company. If perchance any of the minority or outside stockholders wished to share in the benefits of the reorganization, they were allowed to do so only upon paying their pro rata share of the total indebtedness as well as their share of the reorganization expenses. At the same time, the majority stock in the hands of the Southern Pacific Company would, of course, offset and possibly furnish a large profit, if balanced against the amount of loss to the Southern Pacific Company through depreciation in the stock or surplus of the Southern Development Company or the Morgan's Steamship Company.

As the matter turned out, none of the minority stockholders were able or were willing to pay the amount by which they would have been allowed to join the Southern Pacific Company in sharing the benefits of purchasing the entire property of the Houston & Texas Central Railway Company at the price of the reorganization expenses. The general creditors who were parties to the suit, and who had acquired judgments, then unsatisfied of record, were wiped out by the foreclosure decree.

The reorganization agreement was prepared under the direction and apparently after much negotiations of the attorneys for the Southern Pacific Company's directors and officers with the representatives of the bondholders. The rights of the stockholders of the Southern Development Company, of the Morgan's Steamship Company, and of the Houston & Texas Central Railway Company, were all supposedly taken care of by those who were interested in securing a reorganization, from the standpoint of the Southern Pacific Company or the bondholders.

It would appear that some representatives of the minority stockholders had knowledge of the matter before the sale under foreclosure, but during the negotiations as to the reorganization agreement, and even after the arrival of the New York representatives of the Southern Pacific Company and of the various bondholders, in Texas, it is

evident from the record that no notice was given to or had, by the minority stockholders, of the proposed plan of reorganization, until the litigation had been disposed of by what was in effect a consent decree or submission of facts for the entry of a decree, if approved by the court; and but one day intervened, after the various foreclosure suits were gotten in condition for hearing, and before a decree of foreclosure and sale, in the consolidated action, was entered upon the consent of the majority stockholders of the Houston & Texas Central Railway Company and of all the various parties representing the corporations and the bondholders as a class.

The provision in the agreement, that the minority stockholders would be allowed to share in the benefits if they undertook to carry their share of the entire burden, made the decree appear to the court sufficient protection, and, if the court had had the precise question now raised presented, the chances are that the result of the foreclosure actions would have been the same as that which then occurred. In other words, the property of all railroad lines affected by the mortgages was to be sold and the mortgages and judgment liens wiped out. A reorganization was to be effected. The Southern Pacific Company was to purchase the property, while the rights of the minority in that property were admitted by the Southern Pacific Company. The only room for argument would have been the amount which the Southern Pacific Company could exact from the minority stockholders, and as this was to be computed, or, in other words, to be determined in the future, the application of the Southern Pacific Company to do this properly, and to respect the legal rights of the minority stockholders, was recognized in the foreclosure decree, and that decree could not be invalidated by subsequent violation of this obligation on the part of the Southern Pacific Company. But the defenses which could have been urged for protection of the minority stockholders as well were withdrawn and their rights left in the hands of the purchaser, which thereby assumed their protection.

Under these circumstances, the minority stockholders attempted to attack the foreclosure suits and were defeated, although the case, as has been stated, was carried up on appeal and consumed a number of years before final determination. Carey Case (C. C.) 45 Fed. 438; Id., 9 C. C. A. 687; Id., 161 U. S. 115, 16 Sup. Ct. 537, 40 L. Ed. 638.

They then brought suit in the Supreme Court of the state of New York to attack the amount which the Southern Pacific Company required them to pay as a part of the expenses in return for being allowed to share in the reorganization agreement. The Supreme Court of New York decided that the amount of the expenses charged against the minority stockholders, and the position in which they found themselves placed, could not be used as a basis for collaterally attacking the proceedings in the foreclosure suit in the United States Circuit Court in Texas. Gernsheim v. Olcott (Sup.) 7 N. Y. Supp. 872; Gernsheim v. Central Trust Co., 61 Hun, 625, 16 N. Y. Supp. 127.[1]

But, again, much time was consumed, and during the same period

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in the Hun Report.

another action (called the MacArdell Case) was begun in the Supreme Court of the state of New York, and carried to the Court of Appeals, where a majority of the court, in an opinion printed in 189 N. Y. 368, 82 N. E. 161, held that an action by minority stockholders, to obtain property purchased under foreclosure, by a reorganization plan, carried out with the consent of the majority stockholders, was what is known as a representative action, in the sense that the validity of the foreclosure suit was involved and that the minority could not thus collaterally attack the jurisdiction of the court having granted the judgment in foreclosure, and question the action of the majority stockholders. The court said that the appellants have abandoned their complaint of fraud and collusion against the corporation, and that inferentially they were assuming the validity of the transfers as against the corporation and affirming the effect of the foreclosure sale; that they were in fact seeking nothing more than to "impress upon the interest of the Southern Pacific Company in the shares of the new company and in the lands a trust obligation to account for profits to its associate stockholders."

But the court said that such an action was "far outside the nature and limits of an action brought in behalf of a corporation against many defendants as alleged workers of fraud and conspiracy whereby the corporation has been stripped of its property."

The action was therefore dismissed. Two judges dissented, holding that the question was presented whether the minority stockholders were entitled to work out, through the old Houston & Texas Central Railway Company, their claim that by the terms of the reorganization agreement the Southern Pacific Company had been permitted to appropriate the whole consideration without regard to the rights of the minority stockholders.

The dissenting judges said, further (189 N. Y. page 390, 82 N. E. page 168):

"It is apparent that any claim the minority stockholders have in equity and by way of lien against the Southern Pacific Company can only be worked out through the old company and in an action where all the parties in interest are represented, as in this case."

The dissenting judges again said that the position of the plaintiffs was not inconsistent with the finding that the purchasers at the foreclosure sale acquired a good title.

The minority stockholders having thus been pointed to a way in which, according to the majority opinion of the court, some action in equity might be stated against the Southern Pacific Company, and according to the minority opinion, some action through the old corporation might be had without regard to the sale of the property in the foreclosure action, brought suit in this court, attempting to allege that the Houston & Texas Railway Company had in some manner or other been deprived of its rights through the decree of foreclosure and the sale had thereunder, and that the minority stockholders were entitled to enforce those rights as against the majority stockholders, or the Southern Pacific Company, into whose hands the majority of the stock was directly traced, and for whom the Central Trust Com-

pany, and Mr. Olcott, who had purchased and held the lands in trust, were acting.

This suit was dismissed in Lawrence v. Southern Pacific Co. (C. C.) 180 Fed. 822, because this court felt that the precise action, discussed by the two dissenting judges in the Court of Appeals in the MacArdell Case, could not be maintained without the presence of the Houston & Texas Central Railway Company. Even if the presence of that company could be secured, it might well be doubted whether the rights of the minority stockholders could be worked out in a representative action, where the corporation in which they owned stock had obtained the benefit of release from its general obligations of debt, and also from all of its various mortgage indebtedness, in return for the giving of a new mortgage of sufficient amount to produce funds to pay the various claims.

But, be that as it may, the present action was instituted by complaint, which, as finally amended, charges in effect that the Southern Pacific Company was the majority stockholder, and secured, by means of the various foreclosure suits and the reorganization agreement, the entire property of the Houston & Texas Central Railway Company, through purchase under foreclosure, under such circumstances that the majority stockholder was bound to respect the rights of the minority stockholders, and to give the minority stockholders a share in any benefit which might accrue, without imposing such burdens as to of themselves furnish a breach of trust.

It will be seen that the present action recognizes the foreclosure suit and decree as giving the Circuit Court of the United States the right to transfer the property and to give good title to the property to the purchaser. It recognizes that validity of this foreclosure action cannot be attacked collaterally. The amount charged as expenses can only be attacked through any alleged collusion or improper consent carried into the decree of the foreclosure action itself. It recognizes that the Houston & Texas Central Railway Company has no interest in the relations of the majority stockholder to the minority, or in the duties and obligations of that majority stockholder, through the acquisition of property to which the purchaser for the Southern Pacific Company has acquired good title, but by which purchase it is claimed it has assumed certain obligations.

In the present action, the difficulties standing in the way of the various foreclosure suits, when fought by the railway company, and before the majority stockholder assented, are not urged as grounds of invalidity in the result of the foreclosure action, but as evidence that the majority stockholder intended to acquire title to the property in such a way as to assume obligations to the minority stockholders, and the question at issue is whether or not it has lived up to those obligations, and whether or not the minority stockholders have a cause of action in case of its failure so to do.

The complaint alleges that the Southern Pacific Company received the entire issue of $10,000,000 of stock, representing the property of the Houston & Texas Central Railway Company as trustee, that the minority stockholders have certain rights which they can enforce

against the trustee who bought in the lands and property, and they ask this court to compel the Southern Pacific Company to account for that stock and all profits and earnings earned therefrom, for the benefit of all stockholders who come into and contribute to the expenses of this action. They ask that the Southern Pacific Company be credited with the moneys actually paid out in connection with the reorganization agreement, and that the balance be distributed ratably to the stockholders according to their holdings of stock.

The defendant has urged the various defenses which have been previously heard as pleas in bar. The disposition made upon the former hearing (reported in [D. C.] 215 Fed. 218) need not be discussed and will be reaffirmed. Nothing has been presented at final hearing which makes any difference with respect thereto, and it becomes more evident, as the entire record is considered, that the Houston & Texas Central Railway Company is not a necessary party to this action, nor would it have the same rights as the minority stockholders, even if present. In other words, this suit seems not to be at all, in its present form, what is known as a representative action.

The defendant urges the validity of the foreclosure suit and disavows collusion or fraud. As has been already stated, the action of the United States Circuit Court in ordering foreclosure and sale seems to have been well founded in law and proper under the circumstances. The Southern Pacific Company, through its control of, a majority of the stock, by its substantially complete ownership of the Southern Development Company and also of the Morgan's Steamship Company, occupied actually, in equity, the position of majority stockholder of the Houston & Texas Central Railway Company. It therefore had the right to and did actually act as such majority stockholder in agreeing upon the form of the foreclosure decree and sale.

The plaintiffs allege that under the terms of the mortgages, other than that of the income and indemnity mortgage, no sale of, the property could have been ordered, until default in payment of the principal.

The defendant urges that the provisions of these mortgages simply prevented a sale by the trustees, but that the court had inherent power to order a sale either in payment of debts or of back and overdue interest. Guaranty Trust Co. v. Green Cove R. Co., 139 U. S. 137, 11 Sup. Ct. 512, 35 L. Ed. 116; Chicago, D. & Vincennes R. Co. v. Fosdick, 106 U. S. 47, 27 L. Ed. 47.

The defendant alleges therefore that the Houston & Texas Central Railway Company had not, through any substantial defense, delayed or held off foreclosures. But it is evident that even if the court might have, under the laws of the state of Texas, upon the proper finding of facts, ordered a sale of the property, it did not do so, and that the foreclosure was ultimately had upon the agreement of the parties, and upon presentation of facts satisfying the court that one sale of the entire property was proper and within the rights of the parties appearing before the court.

Hence, the admission by the plaintiffs that the foreclosure suit must stand, in all respects, and that the Southern Pacific Company is, in effect, the majority stockholder purchasing at a valid foreclosure sale,

brings us immediately to the question whether, in so doing, they had the right to cut off the minority stockholders from a share in the property purchased unless those minority stockholders agreed to join in reimbursing the general creditors of the corporation and to assume all the obligations which would be wiped out by any sale in foreclosure, under any one of the mortgages, or under the aggregate mortgages against the property of the railway company.

The defendant in effect says that while the foreclosure suit was valid and cannot be set aside, and while thereby all debts against the corporation were disposed of as liens against its property, nevertheless these debts have been preserved and have not been outlawed or paid off by agreement and wiped out by decree in the course of the reorganization proceedings. They reach this conclusion because the Southern Pacific Company controlled these creditors of the Houston & Texas Central Railway Company, and thereby furnished the consent of these creditors to have the principal of the mortgages declared due, and to have their own claims against the property wiped out, thus giving up any right of action against the Houston & Texas Central Railway Company, in return for the right to purchase the property at the price of the expense of reorganization alone.

The defendant therefore urges that if the plaintiffs, coming into equity, seek to impress a trust upon the property in the hands of the defendant, they must reinstate the obligations of the general creditors and must recognize the claim of those obligations against any property of the corporation which would, in the hands of the corporation, give value to the shares of stock.

The defendant therefore itself seeks to open the effect of the foreclosure decree, in so far as it terminated the rights of the general creditors to insist upon having the lands of the railway company sold for the payment of the mortgage liens and also of their claims, and hence to reinstate these claims as payable out of the proceeds of those lands.

The defendant thus also seems to waive the presence of the railway company as a party and to urge that, even in the absence of that company, the rights and obligations or debts, as against its stockholders, can be disposed of in the present action from the standpoint solely of the relations of the various stockholders one to another.

The plaintiffs, on the other hand, admit that any yet existing debt against the corporation, or any claim which can be made through the corporation or by a creditor, against its stockholders, may still be urged in a court of law, against the stock in their hands, if in the present action it be decreed that they are entitled to that stock or an accounting for the value thereof.

Under the defendant's theory, it is urged that the lands of the Houston & Texas Central Railway Company were not then marketable, and that the outstanding indebtedness, other than that secured by the mortgages, could not therefore be paid by that means. They thus ask to show that no surplus or equity was shown to exist, which would be available for general creditors, and that from this standpoint the foreclosure suit could not be held to be collusive or fraudulent.

The plaintiffs agree in this proposition and say that for this reason the rights given up by the general creditors were of no value, and that if the majority stockholders of the railway company, through the action of the Southern Pacific Company, could wipe out the unsecured debts, the Southern Pacific Company should not be allowed to insist upon the validity of the foreclosure action, in so far as it cut off or destroyed the claims of those creditors against the property bought in by the Southern Pacific Company, and then to insist that these claims were not wiped out or cut off by reason of the fact that the Southern Pacific Company obtained by purchase the property for itself.

It must be held that the defendant has, for the purposes of the present action, obtained the property free from any lien or claims of the general creditors. The plaintiffs did not have an opportunity to prevent the action of the majority stockholders, in thus acquiring the property of the railway company, and the Southern Pacific Company acquired this property subject to any equitable rights which the minority stockholders might have therein. Such cases as Ervin v. Oregon Ry. & Nav. Co. (C. C.) 27 Fed. 625; Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; Sparrow v. Bement, 142 Mich. 441, 105 N. W. 881, 10 L. R. A. (N. S.) 725; Backus v. Brooks, 195 Fed. 452, 115 C. C. A. 354; Cook on Corp. § 662, and cases cited; Synnott v. Cummings (C. C.) 116 Fed. 40—sufficiently establish the proposition that the minority stockholders had rights which they could enforce against the property in the hands of the majority stockholders. In enforcing these rights, they can insist upon an accounting and division of their property in equity, leaving the property, that is, the shares of stock in their hands, subject to any claims which are still valid and enforceable against the stockholders, either through the Houston & Texas Central Railway Company itself, or against the stockholders directly.

This is the relief asked in the present action and to which the plaintiffs would seem to be entitled. They may have a decree therefor.